429 So.2d 217 (1983)
Frank J. BUSALACCHI
v.
Kenneth E. VOGEL, M.D. and ABC Insurance Co.
No. 13184.
Court of Appeal of Louisiana, Fourth Circuit.
March 4, 1983.
Rehearing Denied April 27, 1983.
*219 Edward J. Rice, Jr., Donna L. Yukna, Adams & Reese, New Orleans, for plaintiff-appellant.
William S. Penick, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, for Mercy Hosp. and Cora Lee Arms.
Roy V. Ladner, New Orleans, for Kenneth E. Vogel, M.D. and ABC Ins. Co.
Before SCHOTT, AUGUSTINE and LOBRANO, JJ.
AUGUSTINE, Judge.
Frank J. Busalacchi brings this action for damages against Kenneth E. Vogel, M.D., Cora Lee Arms, and Mercy Hospital for injuries alleged to have arisen from Dr. Vogel's performance of a percutaneous thoracic rhizotomy, an operation whereby the nerves which transmit sensation from the chest wall of the spine are thermally destroyed by means of heat-producing electrodes inserted at the spine. The frequent objective of such an operation is to eliminate intolerable chest pain. Mr. Busalacchi alleges that the operation was performed without his consent and that Dr. Vogel was negligent in its execution. Following a lengthy trial of the merits, the trial judge rejected the plaintiff's demands and entered judgment on behalf of the defendants. Plaintiff appeals.
Insofar as the plaintiff's medical history bears upon this case, it was admitted in trial that Mr. Busalacchi has had bronchitis for many years and is a heavy smoker. On June 15, 1975, while driving from Baton Rouge to New Orleans, Mr. Busalacchi suffered a particularly violent coughing spell and immediately experienced intense pain in his ribs. Shortly afterward, while on a trip to California, Mr. Busalacchi developed pneumonia. Upon his return to New Orleans, he was seen by Dr. Louis R. Cabiran and by Dr. Jack Castrogiovanni, who successfully treated the plaintiff's pneumonia within a few days. Despite the doctors' success, Mr. Busalacchi continued to experience unbearable pain in his chest, and so, on August 3, 1975, the plaintiff underwent an intercostal nerve block. That procedure, however, provided only temporary relief. The next day, Dr. Castrogiovanni introduced the plaintiff to Dr. Kenneth E. Vogel, a neurosurgeon known to have performed numerous rhizotomies.
Upon examining the plaintiff, Dr. Vogel found tenderness at the T-9 level and formed the impression that the plaintiff's pain was radicular. The doctor then ordered a thoracic myelogram and x-rays of the patient's chest area with rib detail, but the radiologist's report of these tests revealed no abnormalities. Finding no explanation or cause for the plaintiff's intolerable pain, and having the opinion that his pain was not manageable by medication, Dr. Vogel scheduled a rhizotomy. The procedure was explained to the plaintiff and his consent to perform the operation was reduced to writing.
However, on August 6, 1975, the day on which plaintiff's operation was to take place, Mr. Busalacchi had a change of heart, and about two hours before the operation was due to begin, he informed the head nurse, Mrs. Cora Lee Arms, that he no longer wished to go through with the procedure. Nurse Arms noted the withdrawal of consent on the plaintiff's hospital chart and telephoned the operating room to inform Dr. Vogel. She did not speak to Dr. Vogel directly, however, as he was not available to accept the call. Shortly afterward, orders were given by Dr. Vogel to prepare Mr. Busalacchi for the rhizotomy. Within the next thirty-five minutes, the plaintiff received 100 milligrams of demirol and 50 milligrams of phenergan. The rhizotomy was then carried out according to schedule.
Although the operation did provide temporary relief, within a week, the plaintiff was again suffering intolerable pain, and so on the advice of Drs. Vogel and Castrogiovanni, a second rhizotomy was performed. It was only moderately successful. When Mr. Busalacchi was discharged, his doctors recorded a final diagnosis of "intractable left chest pain."
*220 Mr. Busalacchi continued to experience difficulty in his lungs and chest, and in February 1976, he was examined by Dr. Samuel Andrews, who diagnosed his condition as pneumonia. It was later discovered that at that time, Mr. Busalacchi was also suffering from fractured ribs, numbers 7 and 8 on the left side. As the cause of these latest fractures was then unknown (and apparently spontaneous), Dr. Andrews conducted several tests to determine whether the plaintiff was afflicted by any bone disease. Dr. Andrews discovered that Mr. Busalacchi's bones were mildly demineralized, the result of a rare bone disorder later diagnosed as osteogenesis imperfecta tarda.
A month after the resection of ribs 7 and 8, the plaintiff continued to suffer pain in the region of his left chest and, in April of 1976, he was admitted to Baptist Hospital. Chest x-rays taken at that time revealed that Mr. Busalacchi had suffered yet another fractured rib (number 6, left side), whereupon Dr. Andrews recommended that Mr. Busalacchi seek treatment from a team of bone disease specialists in St. Louis, Missouri. Among them was Dr. John G. Haddad, who confirmed in the plaintiff's x-rays "some evidence" of demineralization or lower bone mass. A pathologist's report of the plaintiff's bone biopsies diagnosed plaintiff's condition as osteogenesis imperfecta tarda.

The Malpractice Claim
As presented by the plaintiff, the issues upon which this aspect of the case turns are purely factual:
1. Was the nerve block performed by Dr. Cabiran adequate as a diagnostic tool to determine whether a rhizotomy should be performed?
2. Did the rhizotomies performed by Dr. Vogel cause the later fracture of plaintiff's ribs?
In Canter v. Koehring Co., 283 So.2d 716 (La.1973), the appellate courts of this state were admonished that they should not disturb a trial court's factual findings in the absence of manifest error. As to each of the factual issues raised by plaintiff in this case, the trial court resolved the dispute in favor of the defendant. Our present task, then, is to determine whether the trial court committed manifest error in doing so.
Regarding plaintiff's specific allegations of malpractice, it is Mr. Busalacchi's contention that a rhizotomy is a procedure of last resort which, in his case, should have been preceded by nerve blocks, to ascertain, first, whether a rhizotomy would be appropriate, and second, to identify those nerves which should be destroyed in order to eliminate the plaintiff's pain. Appellant relies upon the expert testimony of Dr. Richard W. Levy, a neurosurgeon, for the proposition that proper pre-rhizotomy procedure required "several peripheral nerve blocks at the root level, rather than locally." Appellant's brief, p. 13 (Emphasis added.) Mr. Busalacchi contends that the intercostal nerve block which was performed in this case, not having been performed at the root level, was insufficient as a diagnostic tool, and that if Dr. Vogel had performed a proper nerve block, he would have known that rhizotomies at those roots where they were in fact performed would have proved futile in relieving pain, as plaintiff insists they were.
In contradiction to appellant's assertion stands the testimony of Dr. Donald Richardson, who stated that in the plaintiff's case, "the nerve block need not have been done at the root, but could have been properly performed `anywhere' between where the pain is and the spine..." Tr. 709. (Emphasis added.) Moreover, the medical record indicates that a nerve block such as the kind prescribed by Dr. Richardson was performed intercostally at five segments above and below the area of pain (level T-9), and that, as a result, Mr. Busalacchi experienced at least temporary relief, indicating the probability that a sensory rhizotomy at those levels (T-7 through T-11) would alleviate or diminish the plaintiff's pain.
Assuming for the sake of argument that the testimony of Dr. Levy contradicted that of Dr. Richardsonfor it is not clear to us that Dr. Levy's testimony must be read to *221 prohibit a local (as opposed to regional) nerve blockit is clear that the trial court did not commit manifest error in resolving the conflict in favor of the defendant. Dr. Richardson is a leading authority on the performance of rhizotomies, having been a pioneer in the development of that operation. The question of the sufficiency of the nerve block administered in this case was well within his expertise as a neurosurgeon, particularly because of his familiarity with pre-rhizotomy diagnostic procedure. We therefore cannot find manifest error in the trial court's determination that the intercostal nerve block administered to the plaintiff was diagnostically sufficient, and that Dr. Vogel was therefore not negligent in relying upon it to indicate the rhizotomy.
As to the execution of the rhizotomies themselves, the plaintiff sought to establish through the testimony of experts that during either the first or second rhizotomy, Dr. Vogel negligently destroyed motor nerves which stimulate the intercostal muscles at levels T-7 through T-11, and that as a result, those muscles were rendered immobile. Appellant contends that the immobility of those muscles led, in turn, to their atrophy and to the eventual demineralization of the ribs to which the muscles are attached. In time, appellant says, the demineralization rendered his ribs susceptible to fracture, as evidenced by the spontaneous breaking of left ribs 6, 7 and 8.
Mr. Busalacchi emphasizes Dr. Vogel's own admission that the aim of a sensory rhizotomy is to destroy sensory nerves while leaving the motor nerves intact. In the face of that admission, appellant offers the testimony of Dr. Richard Levy, a neurosurgeon whose reading of the operative report led him to conclude that Dr. Vogel's placement of electrodes during the first rhizotomy indicated his intention to affect motor nerves as well as sensory nerves. In reaching that determination, Dr. Levy reasoned that although the operative report mentioned motor responses to stimulation by the placement of electrodes at levels T-7 through T-11, the report made no mention of Dr. Vogel's changing the placement of the electrodes subsequent to stimulation so as to avoid destruction of the motor nerves during the rhizotomy.
Appellee responds by noting that, first, the connection between loss of motor activity in the intercostal muscles and demineralization of the ribs is theoretical at best. Dr. Richardson testified that, as a practical matter, destruction of the motor nerves which control the intercostal muscles does not lead to their immobilizationif only some of the motor nerves were destroyed, those remaining intact would have continued to move the entire rib cage, including all of the intercostal muscles, even those whose motor nerves had been destroyed. Dr. Richardson stated that he had never known of a case where a motor rhizotomy or intercostal nerve injury caused demineralization of the ribs and, further, that in performing a thoracic rhizotomy, his own preference is to destroy motor nerves as well as sensory nerves. In sum, he said, unless a motor rhizotomy is done on the whole side of the chest, destruction of the motor nerves is "very unimportant."
Moreover, there was ample evidence that the rhizotomies performed on Mr. Busalacchi did not destroy the intercostal motor nerves. As explained by Dr. Richardson, the nerve fibers which transmit ordinary tactile sensation and pain from the chest wall are more sensitive to heat than motor nerves which innervate the intercostal muscles, so that upon the application of heat to the nerve bundle, the motor nerves will survive longer. It follows that if after the rhizotomy, the sensory nerves continued to supply sensation, the motor nerves cannot have been destroyed. Dr. Richardson testified that when he treated the plaintiff in March 1976 (seven months after the rhizotomies), Mr. Busalacchi was experiencing pain at levels T-7 and T-8. The conclusion to be drawn, of course, is that the rhizotomies performed at those levels had not successfully destroyed the sensory nerves, and therefore, the motor nerves were not destroyed either.
We also note that Mr. Busalacchi suffered a spontaneous fracture of rib number *222 9 well before the rhizotomies, and later a spontaneous fracture of rib number 6, whose nerve roots were not involved in either rhizotomy (both procedures were administered at levels T-7 through T-11).
We affirm the trial court's finding that plaintiff failed to prove a causal connection between the treatment administered by Dr. Vogel and his subsequent rib fractures. Almost every expert witness refused to recognize any causal role in the rhizotomy, and it was affirmatively shown that at least two rib fractures were not even remotely connected with the operation. As demonstrated, the record strongly supports a finding that the probable cause of the plaintiff's injuries was the congenital disease, osteogenesis imperfecta tarda, which results in weakening of the bones. Accordingly, we find no manifest error in the trial court's judgment that Dr. Vogel should be relieved of liability in this matter.

Withdrawal of Consent
Appellant urges as a second ground of recovery that Dr. Vogel performed the first rhizotomy without his consent. It is undisputed that only a short time before the operation, Mr. Busalacchi did notify Nurse Arms of his intention to forego the rhizotomy, whereupon Mrs. Arms noted on the plaintiff's chart: "Wants to cancel his surgery. Dr. Vogel called." Nevertheless, the operation was begun about two hours later. At no time following his revocation of consent did Mr. Busalacchi expressly authorize the rhizotomy which took place. On the other hand, neither did Mr. Busalacchi expressly reiterate his objection to the procedure when it was opportune to do so. Appellant contends that the trial court erred in interpreting his silence immediately before and during the rhizotomy as implied consent, since Mr. Busalacchi was under heavy medication at the time and was therefore incapable of understanding that the rhizotomy had in fact begun.
Appellee asserts, however, that Mr. Busalacchi was capable of appreciating his circumstances and the fact of the ongoing operation, and therefore, that his silence was tantamount to approval.
As before, the dispositive issue thus raised is a factual one, i.e., whether immediately before or during the operation, Mr. Busalacchi possessed the mental capacity to understand that he was undergoing a rhizotomyfor it is clear to us that if he did understand and nevertheless said nothing, the law should regard his silence as implied consent.
The record amply supports the trial court's finding that Mr. Busalacchi was able to sufficiently understand his circumstances immediately before and during the operation. At 12:20 p.m. on August 6, shortly before the first rhizotomy, plaintiff received 50 milligrams of demerol and 25 milligrams of phenergan. The dosage was repeated at 1:05 p.m. Between that time (1:05) and 2:10 p.m. (when the operation actually began), Nurse Arms noted on plaintiff's chart that he was awake and smoking a cigarette. During the course of the operation itself, Mr. Busalacchi was injected with another 20 milligrams of demerol and, intermittently, brevital.
Dr. Vogel testified that, except for those brief periods when the plaintiff was rendered unconscious by the brevital, Mr. Busalacchi was alert, oriented, and communicative, and that if he had not been, the rhizotomy could not have been performed. Such an operation requires oral communication between doctor and patient at every stage. Dr. Vogel stated that, in fact, the plaintiff responded clearly to questions about the location of pain when certain nerves were electronically stimulated, and further, that at no time did Mr. Busalacchi indicate his desire to stop the procedure.
Corroborating Dr. Vogel, Dr. Levy testified that the dosages of demerol and phenergan administered to the plaintiff just before and during the operation would not ordinarily make the average person unaware of his surroundings.
Appellee also emphasized to the trial court that if Mr. Busalacchi had complained about the rhizotomy after it was performed, it would have been noted in the plaintiff's charts, but that Mr. Busalacchi's charts *223 mention no dissatisfaction with the procedure. Finally, appellee points to Mr. Busalacchi's ready consent to the second rhizotomy (less than a week later) as evidence that he at least impliedly consented to the first.
Considering that Dr. Vogel's direct testimony as to appellant's state of mind, if believed, utterly refutes the contention that Mr. Busalacchi was incapable of offering implied consent to the operation, and considering also that Dr. Vogel's testimony was corroborated by circumstantial evidence, we cannot find manifest error in the trial court's determination that Mr. Busalacchi had sufficient presence of mind to object to the operation, but chose not to do so.
We believe that, under the circumstances, the plaintiff's silence constitutes implied or apparent consent, for it is evident that faced with an unwanted operation, a reasonable person would have spoken his objection rather than silently allow it to continue. Dr. Vogel, having already received the plaintiff's written consent to perform the operation, and having no knowledge of its revocation, was entitled to rely on the plaintiff's conduct to imply that the operation should go forward as scheduled.
Our affirmance of the trial court's finding of implied consent renders moot the question whether Nurse Arms, and derivatively, Mercy Hospital, were negligent in failing to insure that the plaintiff's withdrawal of consent was communicated to Dr. Vogel. Accordingly, the judgment of the lower court is affirmed with respect to Cora Lee Arms and Mercy Hospital.

Costs
Finally, we reverse that part of the judgment which cast the defendants in solido for the costs of this action. Louisiana Code of Civil Procedure Article 1920 provides:
"Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable."
In Bowman v. New Orleans Public Service, Inc., 410 So.2d 270 (La.App. 4th Cir.1982), we acknowledged the long-standing general rule that all costs are to be paid by the party cast, except where "equity" dictates otherwise, as where the prevailing party causes purely frivolous expenses. As we stated then, "The underlying principle of Code and jurisprudence is that the party whose behavior unjustifiably causes costs to be incurred ought to pay them." Bowman, supra, at 272. Such a proposition does not translate "equity" to mean "he pays who can best afford it."
We find no basis whatsoever for assessing costs against the defendants in this case, nor has it been shown to us either in the trial court's judgment or in appellant's brief why equity requires a departure from the general rule. A significant majority of witnesses (including many experts) who testified in this case were called on behalf of the plaintiff, and therefore should be charged to his account. We are also mindful that two of the plaintiff's depositions were taken in St. Louis, Missouri, and that one deponent, Dr. Haddad, knew very little about the rhizotomy procedure, had scant experience with patients with broken ribs, and knew little about the practical effects of a motor rhizotomy upon human bones. Nor did the testimony of Dr. Murphy, the other St. Louis deponent, appreciably increase the plaintiff's chances at trial. Finally, considering that the plaintiff utterly failed to carry the burden of proof as to a critical threshold issuewhether the rhizotomies caused the subsequent rib fracturesand that several of the plaintiff's own witnesses refused to recognize such a causal relation, we fail to find in this case any equity which would require the absolved defendants to pay the costs of this matter.
For the reasons assigned, the judgment of the trial court is affirmed with respect to the finding of no liability as to the defendants, Kenneth E. Vogel, M.D.; Cora Lee Arms, R.N.; and Mercy Hospital. That part of the judgment which cast the defendants *224 in solido for costs is hereby reversed, with all costs in this matter to be borne by plaintiff-appellant, Frank J. Busalacchi.
AFFIRMED IN PART.
REVERSED IN PART.
LOBRANO, J., concurs with written reasons.
LOBRANO, Judge, concurring.
I agree with the affirmance of the instant case in favor of Dr. Vogel, Nurse Arms and Mercy Hospital. However, I feel it necessary to emphasize that the particular circumstances of this case, and the overwhelming evidence of implied consent, negate the patient's withdrawal of consent prior to the operation. Had those extreme circumstances not been existent in this case, the liability of all defendants in operating after a patient withdraws his consent would have been unquestioned.